F. S. MALCOM ET AL. V. OLOF HANSON.

[FILED MAY 6, 1891.]

1. **Review:** INSTRUCTIONS OMITTED FROM RECORD. Where the instructions given by the court are not set out in the record, error cannot be predicated upon the refusal of the court to give certain instructions which were asked, the presumption being that the court did its duty and gave proper instructions.

2. **Adverse Possession.** Upon the testimony preserved in the record, *held*, that the defendant had acquired title by adverse possession.

ERROR to the district court for Douglas county. Tried below before NEVILLE, J.

*Congdon, Clarkson & Hunt,* for plaintiff in error:

In order that successive occupants may tack the periods of possession, it is not only necessary that there should be priority between them but the holding must be *under the first entry.* (*Crispen v. Hannavan,* 50 Mo., 549; *San Francisco v. Fulde,* 37 Cal., 353; *Austin v. Bailey,* 37 Vt., 219.) If defendant entered upon the land with the intention of buying it from the true owner when he

should be found, such possession is not sufficiently adverse to entitle to the benefit of the statute. (*Davenport v. Sebring*, 52 Ia., 366 ; *Grant v. Fowler*, 39 N. H., 105 ; *Bradley v. West*, 60 Mo., 41 ; *Farish v. Coon*, 40 Cal., 57 ; *Humbert v. Trinity Church*, 24 Wend. [N. Y.], 597 ; *Ewing, v. Burnett*, 11 Pet. [U. S.], 41 ; *Austin v. Holt*, 32 Wis., 490 ; *Bedell v. Shaw*, 59 N. Y., 46 ; *Day v. Wilder*, 47 Vt., 593 ; *Sailor v. Hertzogg*, 2 Pa. St., 182 ; *Stamper v. Griffin*, 20 Ga., 321 ; *Russell v. Davis*, 38 Conn., 562 ; *Turner v. Hall*, 60 Mo., 271 ; *Clement v. Perry*, 34 Ia., 564 ; 3 Washb., R. Prop., 122–3 ; *Groft v. Weakland*, 34 Pa. St., 304 ; *Criswell v. Altemus*, 7 Watts [Pa.], 565 ; *Dikeman v. Parrish*, 6 Pa. St., 210 ; *Brandt v. Ogden*, 1 Johns [N. Y.], 156 ; *Jackson v. Sharp*, 9 Johns. [N. Y.], 163 ; *Gay v. Moffitt*, 2 Bibb [Ky.], 507.)

*Lake & Hamilton, contra:*

Presumptions are in favor of the ruling of the trial court. (*McClure v. Lavender*, 21 Neb., 181.)  Instructions should be construed as a whole, and if when so taken, they state the law of the case correctly, it is sufficient. (*Campbell v. Holland*, 22 Neb., 589.)  The reason for a refusal to instruct need not be given. (*Clough v. State*, 7 Neb., 344, and cases ; *State v. Volmer*, 6 Kan., 371 ; *State v. Schlagel*, 19 Ia., 169 ; *Kerkow v. Bauer*, 15 Neb., 167.) The refusal to repeat instructions is not error. (*Marion v. State*, 16 Neb., 358 ; *Hitchcock v. Hassler*, 16 Id., 469 ; *City of Lincoln v. Holmes*, 20 Neb., 47 ; *Same v. Gillilan*, 18 Id., 114.)

MAXWELL, J.

This is an action of ejectment to recover the undivided one-half of lot 7 block 87, lot 3 block 231, lots —— and 6 in block 234, lot 3 in block 249, lots 6 and 7 in block 251, lot 4 in block 252, and three-fourths of outlot 268, in the city of Florence, Douglas county.

The defendant in his answer denied the allegations of the petition and pleaded the statute of limitations.

During the trial the plaintiff's attorney dismissed the action as to lot 7 in block 84, and the jury returned a verdict for the defendant except lot 6 in block 234 and all that part of outlot 268 east of the railroad.

A motion for a new trial was filed and the defendant was required to disclaim title to the undivided one-half of lot 7, block 87, which he did, whereupon the court overruled the motion for a new trial and rendered judgment on the verdict.

In some way which does not appear the instructions given by the court on the trial were misplaced or lost and do not appear in the record. The plaintiffs in error nevertheless claim that the court erred in refusing to give certain instructions set out in the record. For aught that appears the instructions asked may have been given by the court, and if so, it would be improper to repeat them to the jury and thus give them undue weight.

The invariable rule in this court has been, in cases where error is assigned for the refusal to give instructions, to require the instructions given to be set out in the record so that it may appear that the jury were not directed as to the law on the points stated. All presumptions are in favor of the court below, and error must affirmatively appear to warrant a reversal of the judgment. The instructions, therefore, cannot be considered.

Second—It is claimed that the evidence is not sufficient to sustain the verdict.

The defendant was called as a witness in his own behalf, and on his direct examination testified as follows:

Q. You went into possession of it in June, 1875?

A. Yes, sir.

Q. What lots?

A. Two hundred and fifty-one; two lots, I think, in block 251.

Q. What are the numbers of the lots in 251?

A. I think you have got my list of them.

Q. Six and seven in 251?

A. Yes; I think that is it.

Q. Have you a map there?

A. Yes, sir.

Q. Just refresh your recollection from the map.

A. Lots 6 and 7 in 251.

Q. Now, what did you do upon taking possession of those lots 6 and 7 in 251?

A. In September the same year I bought them in for taxes.

Q. That was in 1875?

A. No, sir; it was the next year, in the fall; I bought them in for taxes.

Q. What did you do on taking possession in 1875?

A. There was a fence on it; I planted a lot of grapes on it.

Q. It was fenced?

A. Yes, sir.

Q. Who built that fence?

A. Man by the name of Paulsen; he is in Europe now; he is there now six years; he worked for me until the fall of 1876.

Q. Then he went to Europe?

A. No, sir, he was in Omaha for two years, and then he went to Europe.

Q. You put out grape vines what year?

A. I put out some trees and grape vines in the fall of 1876, and some the next spring. At that time there was no one wants Florence property; every one fenced in what they wanted; you could buy all that you wanted for two dollars a lot; nobody would pay taxes on it.

Q. How have you used those lots, 6 and 7, since that time?

A. I have used it for fruit right along; it has been cultivated every year.

Q. Since 1875?

A. Yes, sir.

Q. Enclosed during all that time?

A. Yes, sir.

Q. Who has been in possession during all that time?

A. I have been in possession during all that time.

Q. Has your possession ever been questioned by any one until this suit was commenced?

A. No, sir.

Q. Who claimed to be the owner of that property all that time?

A. I claimed to be the owner all the time. I paid the taxes. I paid back taxes from 1860.

Q. You paid up the back taxes?

A. Yes, sir.

Q. From what time?

A. From 1860 and a little later.

Q. Since you went into possession in 1875 you paid the taxes?

A. Yes, sir, and collected everything that was back on it.

Q. At the time this suit was commenced you were then in possession?

A. Yes, sir.

Q. And still in possession?

A. Yes, sir.

Q. And claimed to be the owner during all that time until now?

A. Yes, sir.

Q. What other lots, if any, did you take possession of, and when?

A. Outlot 268. I took possession of it in 1876 and I rented outlot 267. I fenced them in together and block 250. I fenced them in together.

Q. When did you take possession of it; of outlot 268?

A. It was some time in the summer of '76; it was the centennial year.

Q. Now about what time in '76; fix the date as near as you can.   You say it was some time during the summer?

A. It was early in the summer, because I wanted to use it for pasture.   Mr. Ricker had a fence between 49 and 50; we had an agreement I should use his fence; we should keep that fence up for lot 3 in 249; that is in this suit; Mr. Ricker had his stable on that; we should keep the fence up between us.

Q. He became lessee under you of what lot?

A. Lot 3 in 249; he had all his stables on that when I came out here.

Q. Now what improvement did you put on outlot 268?

A. Only fences; it has been flooded with water until this year; I could not do anything on it; I tried to put grass on it, but I could not; I used it for pasture.

Q. You fenced it, however?

A. Yes, sir.

Q. What year?

A. In the summer of 1876; after I had my fence on two or three years the railroad put another fence alongside mine; I tore mine down and joined theirs.

Q. You had an enclosure by joining your fence to the railroad company's?

A. Yes, sir.

Q. Have you been in possession of that ever since?

A. Yes, sir.

Q. And to the present time?

A. Yes, sir.

Q. Claiming to be the owner?

A. Yes, sir.

Q. Has any one disputed your possession from the time you went in possession early in 1876 to the present time, until this suit was commenced?

A. No, sir.

Q. What have you done as owner during all that time?

A. Paid the taxes.

Q. No matter, you have the receipts; you can state generally.

A. On that lot I paid taxes every year since 1860.

Q. You had it enclosed and have been in possession since early in the summer of 1876 to the present time?

A. Yes, sir.

Q. Now this lot 3 in 249, you say Mr. Ricker leased that from you; when did you make that arrangement with Mr. Ricker?

A. When I put that fence there on the bottom his was joining. I told him if he would keep that fence up for the use of his lot, he said he would; finally, in two or three years afterward she gave it up to me; I fenced it myself.

Q. From 1876 until two or three years afterwards he was in possession under you under the arrangement you had with him?

A. Yes, sir.

Q. What other lot, if any, did you take possession of, of these in controversy.

A. Four in 252.

Q. When did you take possession of that?

A. The same summer.

Q. What time in the summer of '76?

A. Early in the summer.

Q. How early do you think? Fix the time as near as you can.

A. I think it was so early that the man when he dug the holes struck frost in the ground. I bought 800 fence posts from the U. P. railroad in 1875, I used them to fence that.

Q. You used them in fencing this ground?

A. I had a man haul them home in the winter time; some I had left I put in my grape vines.

Q. What did you do on lot 4, block 252, besides fencing it.

A. Plowed it up and cultivated it.

Q. It has been in cultivation since?

A. Yes, sir.

Q. What did you raise on it?

A. Corn, and potatoes, and so forth.

Q. Who has paid the taxes on this property since that time?

A. I have.

Q. Has your possession or rights of the property been questioned since the time you took possession in 1876, in the spring of 1876 up to the time of the commencement of this suit?

A. No, sir.

Q. Have you been disturbed at all?

A. No, sir.

Q. What have you on this lot, if anything?

A. Corn.

Q. What other lot, if any?

A. The others I didn't take possession of; the next year I had it plowed by Mr. Powell.

Q. Who plowed it?

A. I think it was Lafayette Powell.

Q. What year?

A. I think it was the summer of '76.

Q. What did he plow?

A. He plowed two blocks.

Q. You took possession by way of plowing what lots?

A. It was block 234 and 235.

Q. There was lot 23 and 6 in 234, now take lot 6 in 234, when did you have that plowed?

A. I had it plowed in the summer of '76 but it was not fenced until the next year. I rented it out to a man named Bayless.

Q. What time in the year 1876 did you have it fenced?

A. It was not fenced until 1877.

Q. You took possession at what time in the summer of 1876?

Malcom v. Hanson.

A. I think Mr. Powell can remember what time it was in the summer. He had a span of oxen to plow with, it was in the summer, I think, of '76, in the early part of the summer; it was hard plowing; there was so much sumach.

Q. What did you have it plowed for?

A. I wanted it cultivated.

Q. You plowed it for the purpose of cultivating it?

A. Yes, sir.

Q. Did any one else before you have any plowing done there on that lot?

A. No, sir.

Q. You enclosed it with a fence the following year?

A. Yes, sir.

Q. What have you done with it since?

A. I rented it.

Q. To whom?

A. To different parties.

Q. They have been tenants under you?

A. Yes, sir.

Q. Whose possession is it in now?

A. It is in my possession. Every fall it comes into my possession.

Q. You lease it out every year in the spring?

A. Yes, sir.

Q. You have been the landlord and proprietor ever since 1876? Since you plowed it?

A. Yes, sir. I have paid the taxes.

Q. You paid the taxes how long?

A. I paid —— there was '60 and '61 I paid back taxes, there was nothing back on it until '73 and '74, since that time I have paid all the taxes right along.

Q. Is that now enclosed?

A. Yes, sir.

Q. Have you been disturbed in the ownership of that property, from the time you took possession and com-

menced plowing in 1876 up to the commencement of this suit?

A. No, sir.

Q. Is there any other of the property in controversy in this suit that you took possession of by yourself or tenants?

A. There is lot 7, in block 84. I rented it out to Mr. Reeves; they have been paying me fifty cents a year rent for it.

Q. When did you take possession of that?

A. They began to pay me, I think it was in '78, and I had one of his half acre lots fenced in block 250. We had an understanding we should have what other lots were inside his fence, and I should fence that other one in my pasture. They had a good many of mine. I thought I didn't get enough rent; he paid me fifty cents a year, and I paid him $1.

Q. You paid him rent and he paid you rent?

A. Yes, sir.

Q. When did he commence paying you rent?

A. I think it was '78. He paid me the first year. He knew all the time I was the owner of it.

Q. You rented it to whom?

A. William Reeves.

Q. Any other lot you took possession of?

A. Lot 7 in block 87. I bought that of Mr. Perry. He bought that at the sale. I have got him here; he will know who he sold it to; it had been sold two or three times.

Q. This lot 7 in block 87?

A. Yes, sir.

Q. Under what purchase did you obtain that lot?

A. I got a warranty deed from a man named Morrow.

Q. When?

A. It was a year and a half ago. There is a big house on that with about $1,500 of improvements on it.

Q. How long has that house been built?

A. I don't remember. I think Mr. Perry can tell better; he bought it at the sale and he sold to a man by the name of Bayless and Bayless sold to Morrow.

Q. What improvements are there on lot 7 in 87.

A. There is a house 16x40, and then there is a wing, I should judge 16x18 or 16x20. There are a lot of trees and a nice picket fence in front, and a barn that is not much account. I consider the improvements from $1,200 to $1,500. It is a new house with a good foundation, with three good chimneys on it?

Q. You purchased that about how long ago?

A. It was in the spring ——.

He also testifies that lot 6 in block 251 was planted with grapes, and that lot 7 in the same block was fenced, that outlot 268 was fenced and used as a pasture, that lot 3 in block 249 was used for the same purpose.

The testimony of the defendant is corroborated by other witnesses, and the real estate, which the jury awarded to him, is clearly shown to be his by adverse possession.

The question has been so frequently decided by this court that it is scarcely necessary to cite the cases.

In *Crawford v. Galloway*, 29 Neb., 261, the adverse possession was maintained by cultivating the block for more than ten years, and it was held to be sufficient and the same rule had previously been announced in *Tourtellotte v. Pearce*, 27 Neb., 57 ; *Tex v. Pflug*, 24 Id., 666 ; *Levy v. Yerga*, 25 Id., 766 ; *Gue v. Jones*, Id., 641 ; and *Schock v. Falls City*, 31 Neb., 599, recently decided by this court. Many other cases to the same effect could be cited.

It is contended on behalf of the plaintiff that as to some of the real estate awarded him by the verdict of the jury, his possession was not adverse, because in his testimony he says that he bought the property at tax sale in order to have the owners redeem the same. An examination of the testimony, however, shows that the lots, to

which the cross-examination refers, were situated in blocks 236, 237, and 241, and were purchased in the year 1875, and were not in controversy in this action.

There is no error in the record and the judgment is

AFFIRMED. ·

THE other judges concur.